Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| Ada Mojica Rodríguez y otros<br><br>**Apelante**<br><br>V.<br><br>ESSROC, San Juan Italcementi Group, et als.<br><br>**Apelado** | TA2025AP00047 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil. Núm.<br>D CD2015-2467<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Bonilla Ortiz y la Jueza Mateu Meléndez.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 18 de junio de 2026.

El 20 de junio de 2025, la Sra. Ada Mojica Rodríguez (señora Mojica) y un grupo de transportistas (en conjunto, los apelantes) comparecieron ante nos mediante un recurso de *Apelación* y nos solicitaron la revisión de una *Sentencia* que se emitió el 24 de marzo de 2025 y se notificó el 1 de abril de 2025, por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* presentada por ESSROC San Juan Italcementi ahora Argos San Juan Corp. (Argos o la apelada). En consecuencia, desestimó, con perjuicio, todas las reclamaciones en contra de este.

Por los fundamentos que expondremos a continuación, ***confirmamos*** el dictamen apelado.

I.

---

[1] Caso reabierto mediante Mandato del Tribunal Supremo de fecha 15 de mayo de 2026.

El 16 de octubre de 2015, la señora Mojica y demás demandantes presentaron una *Demanda* sobre cobro de dinero en contra de la parte apelada.[2] Sostuvieron que brindaron servicios de transporte a la entidad Argos desde el año 2005 hasta el año 2013. Alegaron que, durante este tiempo, Argos se mantuvo pagando a los camioneros tarifas inferiores a las dispuestas por la Comisión de Servicio Público (CSP). A tales efectos, adujeron que la apelada les adeudaba dinero, por concepto de tarifas y ajuste de combustible.

En respuesta, el 23 de noviembre de 2015, la parte apelada presentó una *Moción de Desestimación* al amparo de la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2.[3] Reclamó, entre otras cosas que: las controversias de la *Demanda* eran cosa juzgada; las reclamaciones estaban prescritas bajo el Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5141 o en la alternativa, el Art. 1867 del Código Civil de Puerto Rico de 1930, 31 LPRA sec.5297.

En particular, arguyó que los apelantes reclamaban en la Demanda el pago de las mismas cantidades que previamente habían exigido ante la CSP por concepto de tarifas y ajuste de combustible. Respecto a la defensa de prescripción, sostuvo que no había incumplido obligación contractual alguna, por lo que el reclamo debía evaluarse como uno de naturaleza extracontractual. A esos efectos, planteó que los apelantes conocían, desde aproximadamente el año 2005 y hasta abril de 2013, que las tarifas pagadas por ESSROC diferían de aquellas promulgadas por la CSP. En consecuencia, alegó que el término prescriptivo de un (1) año comenzó a transcurrir desde el año 2005, por lo que la demanda

---

[2] *Véase*, Entrada Núm. 1 del apéndice del recurso, SUMAC TA.
[3] Como mencionamos más adelante, en cumplimiento con una *Resolución* que emitimos, la Secretaría de Bayamón nos proveyó una copia de esta solicitud de desestimación. Además, posteriormente, la parte apelada la incluyó como parte de su apéndice.

presentada en 2015 estaba prescrita. En la alternativa, sostuvo que aún bajo el término prescriptivo de tres (3) años aplicable a las reclamaciones por servicios prestados, la acción también resultaba tardía, ya que dicho término comenzó a decursar en 2005 y venció en 2008.

El 11 de febrero de 2026, los apelantes presentaron su *Oposición a la Moción de Desestimación*.[4] Alegaron que las reclamaciones no eran cosa juzgada, puesto que la CSP no tenía autoridad legal para resolver controversias de cobro de dinero por tarifas adeudadas. Añadieron que, esta doctrina tampoco aplicaba pues las causas de acción eran distintas. Por otra parte, en cuanto al planteamiento de prescripción, arguyeron que su causa de acción no era una reclamación fundamentada en obligaciones extracontractuales por lo que no era de aplicación el término prescriptivo de un (1) año, establecido en el Art. 1868 del Código Civil de 1930, 31 LPRA sec.5298. De igual forma, sostuvieron que tampoco se trataba de un reclamo de salarios, por lo que no le aplicaba el término prescriptivo de tres (3) años, para este tipo de reclamación. Adujeron el término prescriptivo aplicable a la controversia era el de quince (15) años, por tratarse de una reclamación de cobro de dinero.

Evaluados los escritos de las partes, el 23 de mayo de 2016, el TPI emitió una *Sentencia* que se notificó el 3 de junio de 2016 en la que determinó que era de aplicación la doctrina de cosa juzgada.[5] En consecuencia, desestimó la *Demanda*. Inconforme con este dictamen, los apelantes presentaron el recurso de apelación de alfanumérico KLAN201601395. El 28 de marzo de 2018, un panel hermano emitió una *Sentencia en Reconsideración* mediante la cual revocó la sentencia apelada. Concluyó que la CSP no tenía

---

[4] *Véase*, págs. 70-95 del apéndice del recurso en oposición de la parte apelada.
[5] *Véase*, págs. 96-108 del apéndice del recurso en oposición de la parte apelada.

jurisdicción para conceder el pago de tarifas no devengadas que solicitó la parte apelante ante el TPI. Resolvió que la CSP solo tenía autoridad para conceder indemnización monetaria cuando la querella estaba dirigida contra una compañía de servicio público o porteador por contrato, mas no así para con empresas privadas. Así pues, determinó que el TPI incidió al desestimar la *Demanda* y al imponer costas y honorarios de abogado por temeridad. Sin embargo, añadió lo siguiente:

> **Ello sin perjuicio de que, al devolverse el caso, el TPI considere la procedencia de las otras defensas planteadas en la Moción (por ejemplo, actos propios, manos sucias y prescripción), las cuales no fueron adjudicadas por el TPI y sobre las cuales no nos corresponde emitir criterio en esta etapa.**

Así las cosas, el 14 de junio de 2018, la parte apelada presentó su *Contestación a Demanda y Reconvención.*[6] En esta, levantó diecisiete (17) defensas afirmativas, no obstante, no incluyó la prescripción.

Concluido el descubrimiento de prueba, el 14 de septiembre de 2021, Argos presentó una *Moción de Sentencia Sumaria* fundamentada únicamente en la defensa de prescripción.[7] Luego, el 14 de octubre de 2021, los apelantes presentaron una *Moción en Solicitud de Prórroga.*[8] Mediante esta, indicaron que la solicitud presentada por ESSROC planteaba controversias técnicas y complejas que requerían que requerían un análisis meticuloso y detallado; por lo cual solicitaron se le concedieran treinta (30) días adicionales para presentar su oposición. El 21 de octubre de 2021, el TPI emitió una *Orden,* en la cual denegó una solicitud de prórroga sometida por los apelantes por haber sido presentada tardíamente.[9]

---

[6] *Véase*, Entrada Núm. 3 del apéndice del recurso, SUMAC TA.

[7] *Véase*, Entrada Núm. 4 del apéndice del recurso, SUMAC TA.

[8] Como mencionamos más adelante, en cumplimiento con una *Resolución* que emitimos, la Secretaría de Bayamón nos proveyó una copia de este documento. Además, posteriormente, la parte apelada la incluyó como parte de su apéndice.

[9] *Véase*, pág. 847 del apéndice del recurso en oposición de la parte apelada.

Además, indicó que, ante ello, los asuntos pendientes quedaron sometidos.

No obstante lo anterior, ese mismo día, a saber, el 21 de octubre de 2021, la parte apelante presentó su *Oposición a Moción Solicitando Sentencia Sumaria* en la que consignaron que, al contestar la *Demanda*, Argos no levantó la defensa de prescripción por lo que debía entenderse que esta fue renunciada.[10] Atendido este escrito, el TPI determinó que dicha oposición se tendría por no presentada, por haber sido radicada tardíamente y en incumplimiento con una Orden previa del Tribunal.[11] En consecuencia, ordenó su exclusión del expediente del caso.

El 27 de octubre de 2021, Argos presentó una *Moción Solicitando Permiso para Enmendar la Contestación a la Demanda* para incluir la defensa de prescripción.[12] Fundamentó su solicitud en que: los tribunales a *quo* podían conceder permiso liberalmente para emendar las alegaciones cuando la justicia así lo requiriese; los hechos correspondientes a cada uno de los apelantes que permiten sostener la defensa de prescripción para propósitos de una sentencia sumaria surgieron posterior a la presentación de la *Contestación a Demanda y Reconvención*; no se le está causando ningún perjuicio indebido a los apelantes por la defensa haberse litigado desde la presentación de la *Moción de Desestimación*; la enmienda propuesta no afectaba el itinerario del caso y tampoco era sorpresiva para los apelantes.

En respuesta, el 5 de noviembre de 2021, los apelantes presentaron su escrito en oposición.[13] Atendidos los escritos de ambas partes, el TPI emitió una *Orden* el 10 de noviembre de 2021

---

[10] *Véase*, Entrada Núm. 5 del apéndice del recurso, SUMAC TA.

[11] Este hecho procesal surge de la Sentencia apelada. *Véase*, Entrada Núm. 16 del apéndice del recurso, SUMAC TA.

[12] *Véase*, Entrada Núm. 6 del apéndice del recurso, SUMAC TA.

[13] *Véase*, Entrada Núm. 7 del apéndice del recurso, SUMAC TA.

que se notificó el 17 de noviembre de 2021. [14] En esta, declaró No Ha Lugar la solicitud de Argos para enmendar su alegación responsiva en consideración al tiempo transcurrido desde la presentación del pleito, la comparecencia de la parte demandada y la culminación del descubrimiento de prueba.

Inconforme y luego de denegada una *Moción de Reconsideración,* Argos presentó un recurso de *certiorari* con alfanumérico KLCE202101542 ante esta Curia. En este solicitó que se revocara la determinación del TPI con el fin de que se le permitiera enmendar la contestación a la demanda para incluir la defensa de prescripción. Atendido el recurso, el 18 de febrero de 2023, este panel emitió una *Sentencia* en la cual confirmamos el dictamen recurrido.

Por otro lado, el 12 de febrero y el 18 de diciembre de 2021, los apelantes presentaron mociones de consolidación, en las que alegaron que el caso en controversia tenía hechos y reclamaciones similares al caso *Luis M. Hernández González v. Argos Puerto Rico, Corp.,* con alfanumérico BY2020CV01990.[15] Ambas mociones fueron declaradas No Ha Lugar, debido a que los casos se encontraban en diferentes etapas procesales.[16]

Luego de varios trámites procesales, el 24 de febrero de 2023, Argos presentó una *Moción Urgente Suplementando Moción de Sentencia Sumaria por Circunstancias Excepcionales.*[17] En esta informó que, el 16 de febrero de 2023, un panel hermano de este Tribunal de Apelaciones dictó una *Sentencia* en el caso núm. KLAN202200822, confirmando la desestimación de la Demanda en

---

[14] *Véase,* Entrada Núm. 9 del apéndice del recurso, SUMAC TA.

[15] Este hecho procesal surge de la Sentencia apelada. *Véase,* Entrada Núm. 16 del apéndice del recurso, SUMAC TA.

[16] Este hecho procesal surge de la Sentencia apelada. *Véase,* Entrada Núm. 16 del apéndice del recurso, SUMAC TA.

[17] Como mencionamos más adelante, en cumplimiento con una *Resolución* que emitimos, la Secretaría de Bayamón nos proveyó una copia de este documento. Además, posteriormente, la parte apelada la incluyó como parte de su apéndice.

el caso *Luis M. Hernández González v. Argos Puerto Rico, Corp.*, por prescrita. Indicó que, allí la parte apelada había presentado una *Moción de Sentencia Sumaria* en la que alegó que la reclamación de los apelantes era una de naturaleza extracontractual y no de cobro de dinero. Sostuvo que, en el referido caso, la reclamación era una por incumplimiento con las leyes y reglamento de la CSP. Añadió que no se aludió incumplimiento con cláusula contractual alguna; por lo tanto, la responsabilidad, si alguna, era extracontractual. Indicó que, a raíz de esto, el TPI desestimó la demanda y el panel hermano de este Tribunal de Apelaciones confirmó dicho dictamen.

Evaluados los escritos relacionados a la solicitud de sentencia sumaria, el 24 de marzo de 2025 el TPI emitió una *Sentencia* que se notificó el 1 de abril de 2025.[18] En primer lugar, formuló las siguientes determinaciones de hechos respecto a cada demandante:

## A. Ada Mojica Rivera

1. ...

2. AMR le ofrecía servicios a ESSROC utilizando los camiones de su propiedad desde el año 1993 hasta el año 2013.

3. AMR firmó el primer contrato con ESSROC en el año 1993.

4. AMR no volvió a firmar ningún contrato con ESSROC luego del año 2005.

5. ...
6. ...
7. ...
8. ...
9. ...

10. Desde el año 2004 [ó] 2005, AMR no firmó otro contrato porque estaba de acuerdo con la tarifa propuesta por ESSROC, pero le siguió prestando sus servicios.

11. El Apartado I del "Contrato de Servicios de Transportación" dispone que ESSROC: "pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante"

---

[18] *Véase*, Entrada Núm. 16 del apéndice del recurso, SUMAC TA.

12. Según el Apartado J del "Contrato de Servicios de Transportación":

Las partes reconocen la autoridad de la Comisión de Servicio Público (CSP) para regir la transportación de carga en Puerto Rico y establecer las tarifas aplicables a cada categoría de transporte particular. Reconocen además, su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público a tenor con el Reglamento para las Empresas de Transporte de Carga emitido por la Comisión de Servicio Público en agosto de 2003 y lo resuelto por el Tribunal de Circuito de Apelaciones para la Región Judicial de Bayamón en el caso <u>Texaco Puerto Rico, Inc. Et als. Vs. Comisión de Servicio Público</u> según Sentencia del 12 de diciembre de 2002. A tales efectos las partes establecen las tarifas aplicables a eta contratación las que se hacen formar parte del presente Contrato como Anejo I.

13. ...

14. Conforme al "Contrato de Servicios de Transportación", AMR admitió que ESSROC le informó que las tarifas que estaba dispuesto a pagarle eran distintas a las establecidas por la CSP.

15. Para el año 2012, AMR se enteró que las tarifas que ESSRO le estaba pagando eran menores a las establecidas por la CSP.

16. El 7 de agosto de 2012, AMR y otros compañeros se reunieron con el personal de ESSROC para presentarles una propuesta e inquirieron sobre la baja en tarifas.

17. AMR y otros compañeros presentaron una *Querella* ante la CSP porque no llegaron a ningún acuerdo con el personal de ESSROC en dicha reunión.

18. La *Querella* en contra de ESSROC fue presentada ante la CSP el 7 de agosto de 2012.

19. En la *Querella,* se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

20. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

21. ...

22. AMR admitió que la cantidad por ajuste de combustible solicitada por ella en la *Demanda* está basada en la diferencia entre lo que la compañía le pagaba

incorrectamente en ese momento y el ajuste por combustible establecido por la CSP.

23. Para el cálculo de la tarifa, AMR utilizó la diferencia entre lo dispuesto por la CSP versus lo que se les estaba pagando, aclarando que era un "aproximado".

24. AMR admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

25. ...

**B. Arturo Santos Morales**

1. ...
2. ...
3. ...

4. ASM nunca firmó un contrato de servicios con ESSROC.

5. El padre de ASM era quien tenía un contrato con ESSROC.

6. ASM asumió las responsabilidades de su papá para ESSROC

7. ASM recibió la tabla de las tarifas que ESSROC le iba a pagar desde su primera semana de trabajo.

8. ASM admitió conocer que las tarifas que le iban a pagar eran menores a las que establecía la CSP

9. ASM aceptó que ESSROC le pagó conforme a la table que le había facilitado desde la primera semana.

10. Para el año 2009 [ó] 2010, ASM tuvo conversaciones con ESSROC porque no estaba de acuerdo con lo que le estabas pagando.

11. ...

12. Para el cálculo de la cuantía solicitada por ASM en la *Demanda*, se utilizó su W-2 y unos talonarios.

**C. José A. Morales Marrero**

1. ...

2. JMM revisó y firmó un contrato con ESSROC.

3. JMM admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

4. El Apartado I del "Contrato de Servicios de Transportación" dispone que ESSROC: "pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

5. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

6. JMM aceptó las tarifas que ESSROC le estaba pagando mientras le prestaba sus servicios.

7. JMM admitió que las tarifas pagadas por ESSROC fueron siempre menores a las establecidas por la CSP.

8. JMM firmó el contrato y aceptó el pago de las tarifas aun sabiendo que eran menores a las establecidas por la CSP.

9. JMM formó parte de la *Querella* presentada ante la CSP.

10. …

11. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

12. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

13. …

14. La cantidad solicitada por JMM en la *Demanda* fue un cálculo que realizó obteniendo los números de SURI, con la ayuda de su hermano que es CPA y utilizando una libreta donde anotaban los viajes que realizaba.

15. JMM admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**D. Luis D. González Cuevas**

1. …

2. …

3. ESSROC le pagó las tarifas a LGC conforme lo establecieron por contrato y el aceptó el pago.

4. …

5. …

6. El Apartado I del "Contrato de Servicios de Transportación" dispone que ESSROC: "pagará al

CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

7. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

8. LGC conocía que las tarifas pagadas por ESSROC era distintas a las establecidas por la CSP desde aproximadamente que presentó junto a otros compañeros la *Querella* en el año 2012.

9. ...

10. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

11. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

12. ...

13. ...

14. ...

15. La cantidad solicitada en la *Demanda* por LGC es un estimado sacado de unas anotaciones en una libreta de su propiedad, incluyendo los viajes que hacía y lo que le pagaban.

16. ...

17. LGC admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**E. Ovidio Hernández Adorno**

1. ...

2. Desde que OHA empezó en ESSROC (San Juan Cement) firmó un contrato y le advirtió a su supervisor que el contrato era ilegal.

3. ...

4. El "Contrato de Servicios de Transportación" entre ESSROC y OHA fue renovado en el año 2012.

5. OHA conocía que las tarifas que le pagaba ESSROC eran menores a las establecidas por la CSP.

6. OHA dialogó con sus supervisores, cuando en el año 2005 las tarifas en ESSROC vinieron por millas. A pesar de haberle llevado toda la evidencia de la CSP para defender el pago que les correspondía, ESSROC no le pagó la tarifa solicitada,

7. OHA llevaba "peleando" con ESSROC el asunto de las tarifas desde antes del año 2005.

8. La cantidad reclamada por OHA en la *Demanda* está basada en los años que trabajó para ESSROC.

9. Según OHA, los documentos utilizados para el cálculo de esta cantidad fueron los conduces.

10. ESSROC terminó la relación con OHA porque consideró que estaba a favor de la huelga interna de sus empleados, así que desistió del uso de sus servicios.

11. OHA admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

## F. Wilfredo Olivo Dennis

1. …

2. …

3. …

4. WOD firmó un contrato cuando comenzó a trabajar con ESSROC.

5. WOD admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

6. El Apartado I del "Contrato de Servicios de Transportación" dispone que ESSROC: "pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

16. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del    Contrato.

7. WOD conocía desde el año 2005 que la tarifa de ESSROC era diferente a la establecida por la CSP.

8. WOD no rechazó el pago que le hacía ESSROC, aunque ellos pagaban una tarifa y la CSP tenía otra.

9. WOD no sabe cómo se calculó la cantidad reclamada por él en la *Demanda* y admitió que eso es lo que

"supuestamente" les dejaron de pagar desde que cambiaron las tarifas.

10. ...

11. ...

12. WOD admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

## G. Luis E. Castro Torres

1. ...

2. ...

3. LCT le brindó servicios a ESSROC desde el año 2008, terminando en diciembre del 2011.

4. LCT sólo firmó un contrato con ESSROC.

5. El contrato con ESSROC, LCT lo firmó el 25 de junio de 2009 y fue el único que firmó.

6. El Apartado I del "Contrato de Servicios de Transportación" dispone que ESSROC: "pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

7. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

8. Al momento de firmar el contrato, ESSROC le informó a LCT las tarifas que le iba a pagar.

9. Desde el año 2012, LCT conocía que las tarifas pagadas por ESSROC no eran las establecidas por la CSP.

10. ...

11. ...

12. ...

13. En la *Querella,* se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

14. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

15. ...

16. LCT no conoce como se llegó al cálculo de la cantidad solicitada en la *Demanda* y cuanto ESSROC le debe. Tampoco sabe cu[á]nto es la diferencia entre la tarifa de la CSP y lo pagado por ESSROC.

17. ...

## H. Luis A. Castro Díaz

1. El Sr. Luis A. Castro Díaz ("LCD") trabajó como camionero independiente para ESSROC desde el año 1995 al año 2007.

2. LCD firmó un solo contrato con ESSROC.

3. LCD firmó el contrato con ESSROC en mayo del año 1995.

4. ...

5. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

6. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

7. En el momento que LCD contrató con ESSROC, se le informó las tarifas que se le iban a estar pagando y el firmó el contrato.

8. LCD sabía que las tarifas pagadas por ESSROC conforme al contrato eran menores a las establecidas por la CSP.

9. ESSROC le pagó a LCD lo estipulado en el contrato y el pago fue aceptado por él.

10. LCD dejó de brindarle servicios a ESSROC porque se enfermó y se fue de Puerto Rico.

11. ...

12. ...

13. En la *Querella,* se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

14. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible

pagando una cantidad menor a la establecida en el reglamento.

15. ...

16. La cantidad solicitada por LCD en la *Demanda* salió de sus planillas.

17. LCD admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**I. José Aníbal Jiménez Ruiz**

1. ...

2. JJR comenzó a trabajar para ESSROC en el año 1991 aproximadamente y estuvo fuera entre los años 1995 al 1999 periódicamente. Después regresó a ESSROC desde el año 2000 hasta el 2013.

3. JJR voluntariamente firmó el contrato con ESSROC para el periodo comprendido entre los años 2005 y 2013.

4. JJR admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

5. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

6. JRR admitió que el contrato establecía que las partes reconocen que las tarifas pactadas eran diferentes a las de la CSP.

7. JRR admitió que existía un papel que contenía las tarifas que pagaba ESSROC por pueblo.

8. JJR aceptó el pago realizado por ESSROC.

9. JJR y un grupo de compañeros le solicitaron a ESSROC un aumento en las tarifas porque las encontraban bajitas.

10. ...

11. ...

12. En la *Querella,* se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

13. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible

pagando una cantidad menor a la establecida en el reglamento.

14. ...

15. La cantidad que se incluyó en la *Demanda* como la reclamada por JRR, se obtuvo de las planillas que JRR le entregó a su abogado y a un contable.

18. JRR admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

## J. Rodrigo Canales Raymundi

1. El Sr. Rodrigo Canales Raymundi ("RCR") es camionero y comenzó a trabajar con ESSROC desde el año 1978 aproximadamente.

2. ...

3. ...

4. RCR firmó un contrato con ESSROC, luego de llevar un tiempo trabajando.

5. ESSROC le continuó pagando a RCR la misma tarifa que le pagaba antes de firmar el contrato.

6. ...

7. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

8. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato. RCR formó parte de la *Querella* presentada ante la CSP.

9. ...

10. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

11. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

12. ...

13. RCR desconoce quien hizo el cálculo de la cantidad reclamada por él en la *Demanda*.

14. RCR entregó sus planillas para que se hiciera el cálculo de la cantidad incluida en la *Demanda*.

15. JRR admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**K. Carlos A. Ruiz Llanera**

1. …

2. CRL trabajó para ESSROC por veintiún (21) años.

3. …

4. …

5. CRL firmó un contrato con ESSROC para el año 2005 y otro en el año 2012.

6. CRL admitió que los contratos de los años 2005 y 2012 eran similares. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

7. ESSROC le pagó a CRL las tarifas conforme establecidas en el contrato y CRL las aceptó.

8. Un (1) año antes de ser suspendido o que le cancelaran el contrato, CRL trató de llegar a un acuerdo con ESSROC en cuanto a la diferencia de tarifa y el ajuste por combustible para seguir operando, pero ESSROC no estuvo de acuerdo.

9. CRL se enteró de la diferencia en las tarifas un (1) año antes de ser suspendido.

10. El cálculo de la cantidad solicitada por CRL en la *Demanda* se obtuvo de unas libretas que le entrego a su abogado.

11. El 23 de abril de 2013, CRL recibió una carta de José Uriol informándole de la terminación de su contrato, efectivo ese mismo día.

12. CRL admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**L. Ángel Cruz Laracuente**

1. …

2. Durante el período comprendido entre el año 1988 y el año 2013, ACL únicamente trabajó para ESSROC.

3. ACL admitió que el "Contrato de Servicios de Transportación" tenía cláusulas similares al contrato que había firmado con ESSROC.

4. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

5. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato. ACL aceptó las tarifas que ESSROC le estaba pagando.

6. ACL conocía que las tarifas de la CSP eran mejores a las que ESSROC le estaba pagando.

7. ACL trató de negociar las tarifas con personal de ESSROC.

8. …

9. ACL se reunió con personal de ESSROC para exigirle mejor paga.

10. ACL se reunió con otros compañeros para discutir la diferencia en tarifa mientras trabajaba para ESSROC.

11. …

12. ACL formó parte de la *Querella* presentada ante la CSP.

13. …

14. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

15. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

16. …

17. …

18. Para llegar a la cantidad solicitada por ACL en la *Demanda*, se usaron las tarifas, los pueblos a los que se viajaba y el tiempo.

19. ACL admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**M. Carlos Ruiz Reyes**

1. ...

2. CRR trabajó para ESSROC hasta el año 2012 [ó] 2013.

3. CRR firmó un contrato con ESSROC.

4. CRR admitió que el "Contrato de Servicios de Transportación" tenía cláusulas similares al contrato que había firmado con ESSROC.

5. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

6. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las     promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

7. CRR aceptó las tarifas que ESSROC le pagó por su servicio conforme al contrato que se firmó.

8. CRR se enteró que la tarifa pagada por ESSROC era menor a la establecida por la CSP cuando hicieron un grupo de camioneros y acudieron a CSP.

9. CRR nunca se reunió con personal de ESSROC mientras trabajaba allí para discutir las tarifas, porque Ada Mojica y Carlos Ruiz Llanera eran los que se reunían con el personal.

10. CRR se reunió con los otros demandantes, una o dos veces, para discutir la diferencia en las tarifas que ESSROC le estaba pagando, mientras era camionero de ESSROC.

11. La cantidad solicitada en la *Demanda* por CRR se obtuvo de los talonarios y unas libretas en donde apuntaba los conduces, pero CRR no se acuerda quien realizó el cálculo.

12. CRR le ofreció servicios a ESSROC hasta el año 2013.

13.          ...

20.          CRR admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**N. Iván Crespo Talavera**

1. ...

2. ...

3. ICT comenzó a trabajar con ESSROC en el año 2006 y estuvo hasta el año 2013.

4. ICT firmó un contrato con ESSROC.

5. ICT se reunió con personal de ESSROC y tuvo la oportunidad de firmar y revisar el contrato.

6. ICT firmó el "Contrato de Servicios de Transportación" con ESSROC el 25 de junio de 2009.

7. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

8. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

9. Al momento de comenzar a trabajar con ESSROC y antes de firmar el contrato, ICT conocía cuál era la tarifa que ESSROC le iba a pagar.

10. ICT se enteró en el año 2013 que las tarifas pagadas por ESSROC eran diferentes a las pagadas por la CSP, cuando terminaron su relación.

11. ICT aceptó los pagos realizados por ESSROC.

12. ICT desconoce quien hizo el cálculo de la cantidad solicitada por él en la *Demanda,* pero que tal vez se utilizaron las copias de los talonarios para hacer el cálculo.

13. La relación de ICT con ESSROC terminó cuando dejaron de darle carga.

**R. Ventura Santos Rodríguez**

1. …

2. VRS le brindó servicios de transporte de carga a ARGOS desde el año 2005 al 2013.

3. VRS firmó el "Contrato de Servicios de Transportación" el 25 de agosto de 2004.

4. VRS admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**S. Juan Carlos Ruiz Reyes**

1. …

2. JRR trabajó para ESSROC desde el año 2005 [ó] 2006 aproximadamente hasta el año 2010.

3. ...

4. JRR se reunió con personal de ESSROC y se le dio un contrato para que lo firmara y lo revisara.

5. ...

6. JRR firmó el "Contrato de Servicios de Transportación" el 25 de junio de 2009.

7. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

8. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

9. ESSROC le informó a JRR las tarifas le iban a ser pagadas y JRR firmó el contrato.

10. ESSROC le pagó a JRR las tarifas informadas y JRR aceptó el pago.

11. Para el año 2008 [ó] 2009, la Sra. Ada Mojica estaba haciendo los trámites con ESSROC relacionados a las tarifas y JRR se enteraba de lo que estaba pasando por la información que ella le brindaba.

12. JRR se reunió con otros demandantes para discutir el disgusto que tenían con las tarifas.

13. JRR formó parte de la *Querella* presentada ante la CSP en contra de ESSROC.

14. La *Querella* en contra de ESSROC fue presentada ante la CSP el 7 de agosto de 2012.

15. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

16. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

17. ...

18. ...

19. Para llegar a la cantidad solicitada por JRR en la *Demanda,* se utilizaron los conduces y los viajes que hizo mientras trabajó para ESSROC.

20. La relación de JRR con ESSROC terminó cuando éste último canceló todos los contratos.

21. JRR admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**O. Ariel Torres Bosch**

1. ...

2. ATB trabajó para ESSROC tres (3) o cuatro (4) años aproximadamente.

3. ATB firmó un contrato con ESSROC cuando comenzó a trabajar y se renovaba casa vez que ellos llamaban para hacerlo.

4. ESSROC le facilitó a ATB una tabla con las tarifas que le iba a pagar.

5. La tabla que ESSROC le entregó a ATB, dividía las tarifas por pueblo o zona.

6. ATB se enteró de la diferencia en tarifas cuando ESSROC le hizo entrega de la tabla.

7. ATB recibió el pago de las tarifas según estaban establecidas en la tabla, mientras trabajaba con ESSROC y él aceptó el pago.

8. ATB admitió que el que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

9. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

10. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las     promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

11. Mientras trabajaba para ESSROC, ATB se enteró que las tarifas pagadas eran menores a las que pagaba la CSP.

12. ATB conoció que las tarifas pagadas por ESSROC eran menores a las pagadas por la CSP cuando le hicieron entrega de la tabla.

13. ...

14. ...

15. ATB admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**P. Víctor M Rodríguez Marzan**

1. ...

2. VRM firmó un contrato con ESSROC.

3. VRM admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

4. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

5. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las    promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

6. ...

7. VRM siempre supo que ESSROC le pagaba menos a lo establecido por la CSP, incluso desde que comenzó a trabajar.

8. VRM admitió que ESSROC sí le pagó por sus servicios y el aceptó ese pago.

9. ...

10. VRM está reclamando en la *Demanda* las tarifas para los años 2005 y 2006 porque después de esos años, dejó de trabajar para ESSROC.

11. La relación de VRM con ESSROC terminó, cuando VRM vendió su camión.

12. VRM admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

**Q. Luis Díaz Rodríguez**

1. ...
2. LDR trabajó con ESSROC desde el año 1999 hasta el 2007 [ó] 2008 aproximadamente.

3. LDR firmó un contrato con ESSROC en el año 2004 [ó] 2005 aproximadamente.

4. LDR admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

5. El "Contrato de Servicios de Transportación" disponía en el Apartado I lo siguiente: "ESJ pagará al CONTRATISTA por los servicios prestado por éste conforme a la tarifa acordada entre las partes según se define en el Apartado J adelante."

6. Según el apartado J del "Contrato de Servicios de Transportación", las partes reconocieron su derecho a negociar tarifas diferentes a las promulgadas por la Comisión de Servicio Público y establecieron las tarifas aplicables a la contratación, las cuales formaban parte del Contrato.

7. LDR admitió que todo el mundo sabía que la tarifa que ESSROC le estaba pagando era distinta a la establecida por la CSP.

8. ESROC le pagó a LDR las tarifas pactadas y LDR aceptó el pago.

9. LDR habló con el supervisor inmediato sobre el ajuste por combustible porque no se estaba haciendo como se supone.

10. En una reunión se habló (incluyendo a LDR) con varios de los jefes de loque estaba sucediendo con las tarifas, ya que éstas no estaban conforme a las establecidas por la CSP.

11. …

12. …

13. …

14. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

15. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

16. …

17. La cantidad solicitada por LDR en la *Demanda* se obtuvo mediante la preparación de unas tablas comparando las planillas y los viajes realizados.

18. …

**R. Joel J. Otero Santos**

1. …

2. JOS trabajó para ESSROC aproximadamente por tres (3) años.

3. JOS firmó un contrato con ESSROC.

4. JOS admitió que el "Contrato de Servicios y Transportación" tiene cláusulas similares a las del contrato que firmó con ESSROC.

5. JOS admitió que el "Contrato de Servicios y Transportación" establece que las partes reconocían que las tarifas pactadas eran diferentes a las de la CSP.

6. ESSROC le pagó a JOS las tarifas pactadas y JOS aceptó el pago.

7. JOS discutió con personal de ESSROC sobre la diferencia del ajuste por combustible.

8. ...

9. ...

10. Las reuniones en las que JOS participó con los otros demandantes se llevaron a cabo mientras su contrato con ESSROC estaba vigente, es decir, mientras JOS todavía trabajaba para ESSROC.

11. Las reuniones con los otros demandantes se celebraron alrededor del año 2013.

12. JOS formó parte de la *Querella* que se presentó ante la CSP.

13. La *Querella* en contra de ESSROC fue presentada ante la CSP el 7 de agosto de 2012.

14. En la *Querella*, se alegó que ESSROC violaba las leyes y reglamentos que regulan la transportación pública al poner en vigor un sistema de tarifas y rutas paralelo y contrario al establecido por la CSP.

15. De la *Querella* surge que también alegaron que ESSROC violaba las disposiciones de la Orden y Resolución que establecía el ajuste por combustible pagando una cantidad menor a la establecida en el reglamento.

16. ...

17. ...

18. ...

19. JOS comenzó a trabajar con ESSROC en el año 2010 y permaneció hasta el año 2013.

20. JOS admitió que en el contrato que firmó con ESSROC acordó que se le pagaran unas tarifas establecidas por la empresa, diferentes a las promulgadas por la CSP.

Conforme a lo anterior y lo resuelto en el caso alfanumérico KLAN202200822, el TPI concluyó que la causa de acción presentada por los apelantes era de naturaleza extracontractual y no contractual. Determinó que la Demanda no alegaba el incumplimiento de disposición contractual alguna y que los apelantes admitieron que las tarifas pagadas por Argos respondían a los términos pactados entre las partes. Sostuvo que el deber alegadamente infringido surgía de obligaciones impuestas por la ley y la reglamentación aplicable, por lo que la reclamación se regía por las disposiciones sobre responsabilidad civil extracontractual y el término prescriptivo de un año.

Asimismo, concluyó que la acción estaba prescrita. A esos efectos, determinó que los apelantes conocían, desde años antes de la presentación de la Demanda, que las tarifas recibidas diferían de aquellas establecidas por la CSP y que, incluso, varios de ellos habían participado en gestiones y reclamaciones relacionadas con dicha controversia. Por ello, resolvió que contaban con la información necesaria para ejercer oportunamente su causa de acción, pero no lo hicieron dentro del término prescriptivo aplicable.

Finalmente, determinó que la querella presentada ante la CSP por algunos de los apelantes no interrumpió el término prescriptivo. Concluyó que la reclamación administrativa y la judicial perseguían remedios distintos y que la CSP carecía de jurisdicción para conceder el remedio económico solicitado posteriormente en la Demanda. En consecuencia, resolvió que la presentación de la querella no tuvo el efecto de interrumpir la prescripción de la acción judicial. A tenor con lo anterior, declaró Ha Lugar la *Moción de Sentencia Sumaria* presentada por Argos y, en consecuencia, desestimó con perjuicio todas las reclamaciones en su contra.

Inconforme con la determinación del TPI, el 16 de abril de 2025, la parte apelante presentó una *Moción en Solicitud de Reconsideración*.[19] Mediante esta, insistió que no procedía la desestimación por prescripción toda vez que Argos había renunciado a esta defensa afirmativa por no haberla interpuesto en su *Contestación a Demanda y Reconvención*. Evaluada la solicitud de reconsideración, el 9 de mayo de 2025 el TPI emitió una *Resolución* que se notificó el 20 de mayo de 2025, en la cual se declaró No Ha Lugar la solicitud de reconsideración.[20]

Aun en desacuerdo, el 20 de junio de 2025[21], la parte apelante presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DESESTIMAR LA DEMANDA POR PRESCRIPCIÓN, EN VIOLACIÓN DE LA DOCTRINA DE LA REGLA DEL MANDATO**

> **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA DEMANDA PRESENTADA NO CONSTITUYE UNA ACCIÓN DE COBRO DE DINERO A LA CUAL LE APLICA EL TÉRMINO DE PRESCRICIÓN DE 15 AÑOS**

Luego de varios incidentes procesales, el 28 de mayo de 2026, emitimos una *Resolución* concediéndole a la parte apelada hasta el 16 de junio de 2026, para presentar su oposición al recurso. Oportunamente, Argos presentó su *Oposición a "Apelación"* en el cual negó que el TPI cometiera los errores que la parte apelante le imputó.

Cabe precisar que, emitimos una *Resolución* ordenándole a la Secretaría de este Tribunal gestionar, dentro del término de cinco (5) días, la obtención de varias mociones, notificaciones y

---

[19] *Véase*, Entrada Núm. 13 del apéndice del recurso, SUMAC TA.

[20] *Véase*, Entrada Núm. 14 del apéndice del recurso, SUMAC TA

[21] El 20 de junio de 2025, la parte apelante depositó en el buzón de este Tribunal su recurso. Posteriormente, el 24 de junio de 2025, el recurso fue presentado en la plataforma de SUMAC TA. Según lo resuelto en *Ada Mojica Rodríguez v. ESSROC, San Juan Italcementi Group,* 2026 TSPR 47, 218 DPR ____ (2026), se toma como fecha de presentación del recurso de epígrafe el 20 de junio de 2025.

comparecencias que forman parte del expediente del caso DCD2015-2467 del TPI. En cumplimiento con dicha orden, la Secretaría remitió las copias de los documentos solicitados.

Con el beneficio de la comparecencia de ambas partes procedemos a resolver el asunto ante nos. *Veamos.*

II.

**-A-**

En esencia, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al.*

*v. Carrasquillo et al.,* 185 DPR 288, 299 (2012). Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una cuestión que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Aponte Valentín et al. v. Pfizer Pharm,* 208 DPR 263, 277 (2021).

En reiteradas ocasiones, el Tribunal Supremo ha establecido que se considera como un hecho esencial y pertinente, aquel que "puede afectar el resultado de la reclamación acorde con el derecho sustantivo aplicable". *Cruz Vélez v. CEE y otros,* 206 DPR 694, 745 (2021). Dicho esto, para que proceda una moción de sentencia sumaria no tan solo se requiere que haya una inexistencia de hechos en controversia, sino que también la sentencia que dicte el foro judicial tiene que proceder conforme al derecho sustantivo aplicable.

En particular, la Regla 36.2 de Procedimiento Civil, *supra,* permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Mun. de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al., supra,* pág. 677. Por el contrario, esa persona viene obligada

a enfrentar la moción de su adversatario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 432 (2013). Específicamente, la Regla 36.3 de Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria. Al amparo de dicha regla, la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.

Según dispone el caso de *Mejías et al. v. Carrasquillo et al., supra*, pág. 300 citando a: *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 280-281 (1990), "al evaluar una moción de sentencia sumaria, los jueces no están limitados por los hechos o documentos que se aduzcan en la solicitud, sino que deben considerar todos los documentos en autos, sean o no parte de la solicitud de sentencia sumaria de los cuales surjan admisiones hechas por las partes".

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra et al.*, 186 DPR 713, 757 (2012). Además, no se debe adjudicar un caso sumariamente cuando existe controversia sobre elementos subjetivos, de intención, propósitos mentales o negligencia, o cuando el factor credibilidad es esencial y está en disputa. *Const. José Carro v. Mun. Dorado,* 186 DPR 113, 129 (2012).

Ahora bien, según *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Lo anterior, debido a que "las partes no pueden añadir en apelación *exhibits*, deposiciones o affidávits que no fueron presentadas oportunamente en el foro de primera instancia, ni pueden esbozar teorías nuevas o esgrimir asuntos nuevos por primera vez ante el foro apelativo". Íd. Además, sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al Tribunal de Primera Instancia. *Íd.*

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del foro primario en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

El Código Civil de Puerto Rico distingue entre los daños derivados del incumplimiento de contrato, a saber, el Art. 1054 del Código Civil, 31 LPRA sec. 3018 y los daños derivados de la culpa extracontractual, Art. 1802 del Código Civil, *supra.*[22] En ambas causas de acción, la "indemnización de daños exige una conducta antijurídica causante de los daños, bien por infringir lo acordado en contrato o bien por infringir el principio general de no causar daño a nadie. *Ramos v. Orientalist Rattan Furnt., Inc.*, 130 DPR, 712, 722 (1992). Sin embargo, el deber de indemnizar es distinto en ambos tipos de reclamaciones. Particularmente, procede la acción en daños contractuales al amparo del Art. 1054 del Código Civil, *supra*, cuando el daño sufrido exclusivamente surge como consecuencia del incumplimiento de una obligación específicamente pactada, daño que no ocurriría sin la existencia del contrato.

Por otra parte, la responsabilidad extracontractual considera "el resarcimiento de el resarcimiento de los daños ocurridos como consecuencia del quebrantamiento del principio general de convivencia social que supone no causar daño a los demás". *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank,* 193 DPR 38, 57 (2015). Mediante esta acción se pretenden reparar los daños "que se producen en el desarrollo de cualesquiera actividades humanas, pero al margen de toda relación jurídica previa entre dañador y víctima". *Ramos v. Orientalist Rattan Furnt., Inc.*, supra, pág. 720. Contrario a lo que ocurre con la responsabilidad contractual, la que se origina del Art. 1802 del Código Civil, *supra,* "surge precisamente como resultado del daño sin que haya mediado relación jurídica previa". *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank,* supra, pág. 57. En fin, la culpa

---

[22] El Código Civil de 1930 fue derogado por la Ley Núm. 55-2020, conocida como el Código Civil de Puerto Rico de 2020. Sin embargo, para propósitos de la disposición de este recurso estaremos citando el Código Civil derogado, pues los hechos ocurrieron durante la vigencia del Código Civil del 1930.

extracontractual no nace de la voluntad de las partes, sino del incumplimiento de unas obligaciones y unos deberes impuestos por la naturaleza y por la ley, necesarias para la convivencia. *Ramos v. Orientalist Rattan Furnt., Inc.*, supra, pág. 721 citando a: H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1986, Vol. 1, Cap. I, pág. 42.

**-C-**

La prescripción extintiva es una institución de derecho sustantivo que extingue el derecho de ejercer determinada causa de acción. *Haedo-López v. Roldan-Rodríguez,* 203 DPR 324, 336 (2019). Sobre el particular, el Art. 1861 del Código Civil de Puerto Rico, 31 LPRA sec. 5291 establece que "[l]as acciones prescriben por el mero lapso del tiempo fijado por la ley". **Así, una vez se agota un término prescriptivo se extingue el derecho a ejercer la causa de acción y la persona sujeta a responder queda exonerada.** (Énfasis nuestro). *Maldonado Rivera v. Suárez y otros*, 195, DPR 182*,* 193 (2016). En ese sentido, la prescripción extintiva es una forma de extinguir las obligaciones. *SLG García-Villega v. ELA et al.,* 190 DPR 799, 814 (2014). La eficacia de esta figura jurídica es automática y se produce *ipso iure* con el transcurso del tiempo fijado por ley, a menos que se realcen los actos interruptores dispuestos en el Código Civil. *Santos de García v. Banco Popular,* 172 DPR 759, 766 (2007).

La prescripción extintiva tiene el propósito de castigar la dejadez en el ejercicio de los derechos y evitar la incertidumbre en las relaciones jurídicas. *SLG García-Villega v. ELA et al., supra*, pág. 813. Así, "[a]l no ejercicio se le otorga un valor de carácter objetivo, de manera que es independiente de cualquier voluntad que existiera en el titular del derecho, el cual no puede dejar sin efecto la prescripción ni oponerse a ella demostrando la inexistencia de una voluntad contrario". *Santos de García v. Banco Popular,* supra, pág. 767 citando a: L. Díez-Picazo y Ponce de León, *La prescripción*

*extintiva en el Código Civil y en la jurisprudencia del Tribunal Supremo*, Madrid, Thomson Civitas, 2003, pág. 127. En otras palabras, "la prescripción es independiente de la voluntad o de los motivos que el titular pudiera tener para su inacción". Íd. Además, es independiente de la existencia de errores o de impedimentos de carácter puramente fáctico. Íd.

Ahora bien, el Código Civil de Puerto Rico regula los términos prescriptivos particulares para las distintas reclamaciones existentes. En lo pertinente, una de las distinciones más notables entre las acciones derivadas de la responsabilidad contractual y la extracontractual estriba en el término prescriptivo que emana de cada una. Esto se agudiza aún más cuando está en juego la vitalidad de la causa de acción por cuestión de la diferencia sustancial entre los términos prescriptivos para las acciones contractuales y las extracontractuales. Arts. 1864 y 1868 del Código Civil de Puerto Rico, 31 LPRA secs. 5294 y 5298, respectivamente. Ello pues, el Art. 1864 del Código Civil, *supra*, dispone que la acción por incumplimiento contractual prescribe a los 15 años, mientras que el Art. 1864 del Código Civil, *supra*, dispone que la acción por responsabilidad extracontractual prescribe al año. *Martínez Marrero v. González Droz*, 180 DPR 579, 592 (2011).

III.

En el presente caso, la parte apelante nos solicitó la revisión de una *Sentencia* que el TPI emitió el 24 de marzo de 2025 y notificó el 1 de abril de 2025. Particularmente, en su primer señalamiento de error, planteó que el TPI erró al desestimar la demanda por prescripción. Específicamente, sostuvo que tal determinación violaba la doctrina de la regla del mandato. Por otra parte, en su segundo señalamiento de error, sostuvo que el TPI erró al determinar que la demanda no constituía una acción de cobro de

dinero a la que le aplicaba el término prescriptivo de quince (15) años. Adelantamos que no le asiste la razón. *Veamos.*

De entrada, cabe precisar que, al revisar la concesión de una solicitud de sentencia sumaria, este Tribunal Apelativo examina el expediente de *novo* y aplica los mismos criterios que el TPI. *Vera v. Dr. Bravo*, supra, págs. 334-335; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. Asimismo, le corresponde evaluar si la moción y su oposición cumplieron con los requisitos formales de la Regla 36.3 de Procedimiento Civil, *supra*, y determinar si existen hechos materiales en controversia o si solo resta aplicar el derecho a hechos no disputados. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1025. Al evaluar el escrito presentado por la apelada, concluimos que este cumple sustancialmente con los requisitos formales antes mencionados. Sin embargo, debe recordarse que la oposición de los apelantes fue excluida del expediente y, por ende, no forma parte de los documentos que podemos considerar en esta etapa apelativa. En consecuencia, la moción de sentencia sumaria quedó sometida sin oposición, por lo que procede examinar si existen controversias materiales de hecho que impidan su adjudicación por la vía sumaria.

Luego de revisar la totalidad del expediente, examinar los argumentos de ambas partes y aquilatar la prueba documental que obra en autos, concluimos que no existen hechos materiales y sustanciales en controversia que impidan disponer del caso sumariamente. Así pues, adoptamos en su totalidad las determinaciones de hechos formuladas por el TPI en la *Sentencia* apelada. En consecuencia, resta determinar si procedía desestimar la demanda por prescripción y si el reclamo de los apelantes constituye una acción de cobro de dinero.

Del expediente ante nos surge una moción de desestimación presentada por Argos el 23 de noviembre de 2015. En dicho escrito,

la parte apelada argumentó que la demanda incoada por la señora Mojica debía ser desestimada, entre otros fundamentos, por tratarse de una controversia previamente juzgada por la CSP y por encontrarse prescrita. Atendida esta moción, el 23 de mayo de 2016 el TPI dictó una *Sentencia* que se notificó el 3 de junio de 2016 mediante la cual desestimó la demanda únicamente bajo el fundamento de cosa juzgada, omitiendo pronunciamiento respecto a las demás defensas planteadas. Inconforme con tal determinación, la parte apelante recurrió en alzada ante este foro y un panel hermano concluyó que la controversia no era cosa juzgada. **No obstante, también aclaró que ello era sin perjuicio de que el TPI evaluara los demás fundamentos de desestimación planteados, incluyendo la defensa de prescripción.**

Posteriormente, y concluido el descubrimiento de prueba, Argos solicitó permiso para enmendar su contestación a la demanda con el propósito de incluir expresamente la defensa afirmativa de prescripción. Dicha solicitud no fue autorizada por el TPI por haberse presentado de forma tardía. En desacuerdo, la parte apelada recurrió de dicha determinación, mediante el recurso alfanumérico KLCE202101542. En dicha instancia, este Tribunal concluyó que no procedía la enmienda solicitada, toda vez que no concurría circunstancia alguna que, a modo de excepción, permitiera enmendar la contestación a la demanda para incluir tardíamente la defensa de prescripción.

Ahora bien, en lo pertinente, aun cuando determinamos que no procedía la enmienda a la contestación de la demanda, el asunto de fondo respecto a la prescripción no había quedado totalmente resuelto. Ello así toda vez que se encontraba pendiente de adjudicación ante el TPI una moción de desestimación presentada con anterioridad a nuestro dictamen en el alfanumérico KLCE202101542, en la cual se planteó expresamente que procedía

desestimar la demanda por prescripción. Por consiguiente, el TPI conservaba plena jurisdicción y facultad para evaluar las defensas esbozadas en dicha moción, incluida la defensa de prescripción allí consignada.

En ese sentido, no tiene razón la parte apelante al invocar la doctrina de la regla del mandato. La premisa sobre la cual descansa su planteamiento es incorrecta. Nuestro dictamen previo no adjudicó en los méritos la defensa de prescripción ni resolvió definitivamente dicha controversia. Se limitó a disponer que la contestación a la demanda no podía ser enmendada para incluir tardíamente dicha defensa afirmativa. Por consiguiente, la controversia relativa a la prescripción permanecía pendiente de adjudicación ante el TPI y podía ser resuelta por dicho foro sin contravenir el mandato emitido por este Tribunal. Así, la determinación apelada no constituye una actuación incompatible con nuestro dictamen previo, sino el ejercicio legítimo de la facultad del TPI para adjudicar un planteamiento que permanecía pendiente ante su consideración. En consecuencia, el primer señalamiento de error no se cometió.

Aclarado lo anterior, procedemos a considerar los méritos del segundo señalamiento de error. Como cuestión de umbral, conviene señalar que, tal y como concluyó el panel hermano en el caso alfanumérico KLAN202200822, la controversia ante nos es de naturaleza extracontractual. No nos persuade el argumento presentado por la parte apelante respecto a que su reclamo en contra de Argos constituye una acción de cobro de dinero derivada de una relación contractual. De un examen de la demanda no surge alegación alguna respecto a un incumplimiento contractual por parte de Argos. Lo que sí surge son alegaciones por parte de los apelantes de que Argos incumplió con la ley y el reglamento de la CSP. Asimismo, los apelantes admitieron que la parte apelada les

pagó según lo pactado, que su reclamo se basa en la diferencia entre lo dispuesto en la ley y lo que Argos les pagó.

El hecho de que haya existido una relación contractual entre las partes no convierte automáticamente toda reclamación posterior en una acción contractual. En este tipo de controversias el factor determinante es identificar la fuente del deber cuyo incumplimiento se alega. En el caso de autos, la obligación que la parte apelante le imputa a Argos no surge de estipulación contractual alguna, sino de disposiciones legales y reglamentarias administradas por la CSP. En otras palabras, la reclamación no se fundamenta en el incumplimiento de una obligación asumida por Argos mediante contrato, sino en el alegado incumplimiento de los deberes impuestos por el ordenamiento jurídico. Por ello, la fuente del deber alegadamente incumplido es inequívocamente extracontractual.

Máxime cuando la propia naturaleza del remedio reclamado confirma el carácter extracontractual de la acción. La parte apelante reclama la diferencia entre la tarifa pagada por Argos y aquella que, según sostiene, debió cobrarse conforme a la reglamentación aplicable de la CSP. Tal reclamación no se deriva de cláusula contractual alguna ni de una obligación nacida del contrato suscrito entre las partes. Por ende, resulta forzoso concluir que la causa de acción interpuesta se fundamenta en una alegada omisión de Argos de cumplir con las leyes y reglamentos de la CSP. De manera que cualquier responsabilidad frente a los apelantes, si alguna, sería necesariamente de naturaleza extracontractual.

Dicho lo anterior, resulta importante apuntalar que la parte apelante conoció o debió conocer el alegado daño ocasionado por el incumplimiento de Argos, al menos desde el año 2012, según surge de las determinaciones de hecho no controvertidas. Es a partir de dicho momento que comenzó a decursar el término prescriptivo de un año para presentar la causa de acción o interrumpir

oportunamente dicho término. En ese sentido, los apelantes admitieron haber formado parte de la querella presentada ante la CSP en el 2012. En esta se alegó que Argos violaba las leyes y los reglamentos que regulan la transportación pública al establecer unas tarifas contrarias a lo pautado por dicho organismo.

Por lo anterior y cónsono con la teoría cognoscitiva del daño, la parte apelante disponía de un año a partir del 2012 para presentar su reclamo en contra de Argos. Dicho término no fue interrumpido mediante la querella presentada ante la CSP, ya que dicho organismo carecía de facultad para conceder el remedio económico reclamado en esta acción contra una entidad privada. No obstante, los apelantes no presentaron su demanda sino hasta el 15 de octubre de 2015, cuando ya había expirado el término prescriptivo de un año.

Así pues, es forzoso concluir que la causa de acción en contra de Argos se encontraba prescrita, ya que transcurrió en exceso el término prescriptivo de un (1) año, desde que la parte apelante tenía los elementos necesarios para ejercer su reclamación. Por ello, el TPI actuó correctamente al desestimar la reclamación y no hemos identificado error alguno que justifique intervenir con su dictamen. Procede, por tanto, confirmar la *Sentencia* emitida el 24 de marzo de 2025.

IV.

Por los fundamentos antes expuestos, ***confirmamos*** el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones